Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to reconsider the evidence, receive further evidence, or rehear the parties or their representatives, and based upon the first-hand evaluation of the witnesses by the Deputy Commissioner, the Full Commission, with minor modifications, AFFIRMS and ADOPTS the Opinion and Award of the Deputy Commissioner as follows:
Based upon the competent evidence adduced at the hearing before the Deputy Commissioner, the Full Commission makes the following
FINDINGS OF FACT
1. On the date of the hearing before the Deputy Commissioner, plaintiff was a thirty-two year old married male who had not only suffered from intermittent chronic back problems since approximate age sixteen, but who on at least three occasions prior to his March 15, 1992 injury had injured his back while working for defendant-employer, including once when he slipped and fell moving trash bales on February 7, 1992. He is a high school graduate, but has no other formal education. His prior work experience included restaurant work, working at a car parts store, and janitorial work, which he had done intermittently for Budd Services since age sixteen.
2. On the date of the hearing before the Deputy Commissioner, plaintiff alleged that he had neither worked nor looked for work since being terminated on or about March 1, 1994 from defendant's employment because of his alleged inability to perform the elevator operator's job, although there are references in the medical evidence indicating that he was employed subsequently to March 1, 1994, on occasion. He was pursuing a claim for Social Security Disability as well as the instant Workers' Compensation claim for continuing total disability benefits.
3. While bending over to pick up some bundles of newspapers to deliver — weighing ten pounds apiece — plaintiff sustained an admittedly compensable back injury March 15, 1992, manifested by back and leg pain, which resulted in an an agreement of the parties, the first of four approved by the Industrial Commission, to pay compensation for periods of disability until he reached maximum medical improvement therefrom in August, 1993.
4. After being examined on the date of injury at the emergency room, plaintiff was referred to an orthopaedic surgeon; and five days later came under the care of Dr. P. Merritt White, who provided a conservative course of treatment, initially consisting of bed rest, medication, and physical therapy. However, when plaintiff exhibited symptom magnification, manifested by his exaggerated pain response, Dr. White referred plaintiff to Comprehensive Medical Rehabilitation, a pain clinic, for a functional capacity evaluation and a work hardening program.
5. In addition to other treatment received at the pain clinic, plaintiff began a series of epidural steroid injections. While undergoing this treatment, he came under the care of Dr. Gary Poehling, another orthopaedic surgeon associated with the Bowman Gray School of Medicine (since Dr. White had left the area), who recommended that plaintiff complete his series of steroid injections and then return to see him.
6. After complying with this recommendation, plaintiff saw Dr. Poehling on August 28, 1992, on which occasion Dr. Poehling released him to return to light duty work on an indefinite basis beginning September 2, 1992.
7. On September 2, 1992, plaintiff returned to light duty janitorial work for defendant-employer in the main building. He was compensated for temporary total disability from March 16 to September 2, 1992 under original of an agreement approved by the Industrial Commission.
8. Plaintiff continued to perform light duty janitorial work in the main building until September 15, 1992, when his March 15, 1992 back injury again became totally disabling, resulting in compensation for his resulting 4 and 3/7 week period of temporary total disability from September 15, 1992 until his return to light duty work on October 16, 1993.
9. Dr. Poehling allowed plaintiff to return to light duty janitorial work with the restrictions that he not lift more than thirty-five pounds or perform repetitive lifting and stooping, and that he be allowed to be off his feet for fifteen minutes every hour. He further restricted plaintiff to working in the Accounting Building rather than the main building, at plaintiff's request, where plaintiff did the same type of light duty janitorial work as in the main building, the only difference being that no one was present in the Accounting Building to supervise his work on the third shift. Plaintiff's request to be assigned to the Accounting Building had nothing to do with his limited capacity to work as a result of the March 15, 1992, back injury; but, rather, merely represented an attempt on plaintiff's part to manipulate the situation to what he perceived as his advantage.
10. Plaintiff continued light duty janitorial work in the Accounting Building until he again became disabled by his March 15, 1992 back injury on June 24, 1993, resulting in a two-day period of temporary total disability that was the subject of the third agreement of the parties. Plaintiff thereafter returned to light duty work in the Accounting Building on June 26, 1993, and continued working there until July 2, 1993.
11. On July 2, 1993, plaintiff again became totally disabled by his March 15, 1992, back injury, resulting in the fourth, and last, agreement of the parties, compensating him for his period of temporary total disability from July 2 to August 23, 1993, when he again returned to light duty work.
12. By August 23, 1993, plaintiff had reached maximum medical improvement, and/or the end of the healing period following his March 15, 1992, back injury, at which time he retained a ten percent permanent partial disability of the back as a result of the injury.
13. Based on the functional capacity evaluation plaintiff had undergone, which indicated appropriate restrictions of lifting not more than twenty pounds and not bending or twisting, Dr. Poehling released plaintiff to return to work on August 23, 1993 with these restrictions, which defendant-employer was able to accommodate in the form of the light duty janitorial job approved by the doctor and taken by the plaintiff. However, the functional capacity evaluation had not accurately assessed plaintiff's limitations, but merely reflected the same symptom magnification and exaggeration of his physical complaints that he had exhibited since his injury. Those complaints were shown to be contrary to his abilities by his subsequent actions.
14. On September 17, 1993, plaintiff applied for a janitorial job at Griffin Temporaries, and stated on his application that he could "stoop, walk, stand, sweep, [and] engage in hand and wrist motions, body rotation, continuous overhead reaching, [and] pushing and pulling on a repetitive basis; could lift twenty pounds continuously and thirty-five to fifty pounds occasionally; and, work in below-normal temperatures", contrary to his representations to Dr. Poehling. He was hired, and worked for three eight-hour days as a janitor at Thermcraft until resigning because of low pay.
15. When plaintiff subsequently applied to Griffin Temporaries for a warehouse worker's job, he again indicated that he was able to perform the essential functions of the job by stooping, walking, bending, standing, and engaging in hand and wrist motion, body rotation, pushing and pulling, continuously lifting twenty to thirty-five pounds, and occasionally fifty pounds. He thereafter worked as a material handler at Sara Lee Printables from October 11, 1993 until November 22, 1993, where he was required continuously to lift up to thirty-five pounds and fifty pounds occasionally. These activities were inconsistent with the alleged physical limitations due to his permanent back injury.
16. Finally, plaintiff's action in changing a car tire during this same period is inconsistent with his alleged inability to lift more than twenty pounds because of his permanent back injury.
17. Within the physical limitations imposed by Dr. Poehling, plaintiff continued doing light janitorial work for defendant-employer until on or about January 6, 1994, when he was transferred to an even lighter job as an elevator operator in a new building being constructed by the defendant-employer. Occupational Safety and Health regulations required this elevator to be manned, and defendant-employer had to assign both a full- and part-time employee to operate the elevator throughout the construction day.
18. The only requirement of plaintiff's new position was the operation of the elevator, and he was allowed to sit or stand in doing so. Although the elevator was outside, not only was it equipped with an electric heater, but the operator could dress warmly to accommodate the outside temperatures. However, on the first day that plaintiff was to operate this elevator, he did not wear appropriate warm clothing or the steel-toed safety shoes required on a construction site, and, therefore, was sent home.
19. When plaintiff complained that he was cold, defendant-employer allowed him to bring his own kerosene heater in addition to the electric heater already in the elevator, and to dress warmly to accommodate the outside temperatures. His complaints of sensitivity to the cold were inconsistent with his stated abilities at the time of applying for another janitorial job at Griffin Temporaries.
20. Plaintiff ran the elevator until on or about January 27, 1994, when he stopped working and claimed that the cold temperatures aggravated his permanent back injury, forcing him to quit. He returned to Dr. Poehling. On the assumption that plaintiff was working outside in an unheated building, Dr. Poehling excused plaintiff from working outside and limited him to working inside a heated building. However, at the time he limited plaintiff to working inside a heated building, not only was Dr. Poehling unaware that the elevator was equipped with an electric heater and that plaintiff was allowed to bring his own kerosene heater, but relied on plaintiff's complaints that the cold aggravated his back. These complaints are not accepted as credible for the reasons stated above, and the first-hand evaluation of the Deputy Commissioner. He was capable of performing the elevator operator's job, which is consistent with the credible lay and medical evidence, including Dr. Grobler's opinion that cold temperatures would not have any adverse affect on plaintiff's ability to perform the elevator operator's job. Due to contrasting observations, the defendant-employer had become aware of plaintiff's lack of veracity through his attempts to manipulate the system, and when plaintiff procured the doctor's excuse to leave the elevator position, the defendant-employer discharged him for good cause.
21. Dr. Poehling referred plaintiff to Dr. Leon J. Grobler, an orthopaedic surgeon associated with the Bowman Gray School of Medicine and a back specialist, who found no reason for plaintiff's not being able to return to either the elevator operator's job, or the type of light janitorial work that he had previously been doing, and noted plaintiff's symptom magnification and the associated tendency to exaggerate his complaints.
22. Dr. Grobler initially felt that plaintiff might be a candidate for a functional rehabilitation program that was not slated to begin until August 1, 1994, and in the interim referred him back to the pain clinic where he had been seen previously. Plaintiff was thereafter treated at the pain clinic, and ultimately underwent another functional capacity evaluation on December 22, 1994 which indicated that he was capable of medium level work — essentially the same type of work he was doing at the time of his injury, rather than the lighter work that he had subsequently done — i.e., light janitorial work as an elevator operator — based on the limitations that Dr. Poehling had placed on him.
23. Plaintiff contends that he was "under medication" at the time of the most recent functional capacity evaluation, and, as a result, the same evaluation did not accurately assess his condition; but contends, rather, that his condition has significantly worsened since he was terminated from defendant's employment on March 1, 1994 because he could not perform the elevator operator's job. This is inconsistent with the results of his functional capacity evaluation indicating either that his condition had significantly improved since his earlier functional capacity evaluation, or that the earlier functional capacity evaluation did not accurately assess his actual limitations and, instead, was a product of plaintiff's own intentional conduct to try to mislead the examiners by claiming that he was only capable of light duty work as opposed to medium work.
24. Plaintiff's condition had not worsened since August, 1993 when he reached maximum medical improvement from the injury and was able to return to work. Rather, his condition improved, as evidenced by the more recent functional capacity evaluation, and prior assessments reflected plaintiff's specific intent to mislead the examiners by overstating his limitations. Plaintiff has at all times remained capable of at least light, if not medium, duty work since August, 1993, and the defendant-employer has or was willing to provide him with work suitable to his capacity. Plaintiff unjustifiably refused to continue his light-duty job after January 27, 1994, alleging inability to perform it, when, in fact, he remained capable of both the light duty janitorial job as well as the elevator operator's job. Furthermore, there were janitorial jobs within his ability to obtain and perform, as he had demonstrated by twice procuring such employment with Griffin Temporaries and Budd Services in the fall and winter of 1993 while he was limited to light work.
* * * * * * * * * * * * * * * * * *
The foregoing stipulations and findings of fact engender the following
CONCLUSIONS OF LAW
1. Plaintiff reached maximum medical improvement and the end of the healing period from and following his March 15, 1992 back injury on or about August 23, 1993, at which time he retained a ten percent permanent partial disability of the back entitling him to thirty weeks of compensation at a rate of $240.13 per week as of August 23, 1993. Defendants are obligated to pay all reasonable and necessary medical compensation expenses incurred by plaintiff as a result of the injury by accident. N.C. Gen. Stat. §§ 97-26, 97-31(23),97-2(19) and 97-25.
2. Plaintiff was compensated for periods of temporary total disability prior to August 23, 1993, when he returned to work for defendant-employer, pursuant to Form 21 and Form 26 Agreements approved by the Commission, and between and since those periods has been capable of actually obtaining and performing employment in the competitive job market, and has not sustained a substantial change in condition since that date entitling him to further compensation benefits. N.C. Gen. Stat. §§ 97-29 and 97-47.
3. Since August 23, 1993, plaintiff has either worked or remained capable of working, and defendant-employer has provided, or attempted to provide plaintiff with work suitable to his capacity, which employment plaintiff has unjustifiably refused to continue since January, 1994. Russell v. Lowe's Product Co.,108 N.C. App. 762, 425 S.E.2d 454 (1993); N.C. Gen. Stat. § 97-32.
4. Lay or medical testimony which, if believed, would tend to establish that plaintiff has remained totally disabled by his March 15, 1992 back injury since he stopped working as an elevator operator for defendant-employer in January, 1994 is not accepted as persuasive based on the reasons stated in the above Findings of Fact and the first-hand evaluation of the witnesses by the hearing Deputy. N.C. Gen. Stat. § 97-84.
* * * * * * * * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following
AWARD
1. Defendants shall pay plaintiff, in respect to his ten percent permanent partial disability of the back, thirty weeks compensation at a rate of $240.13 per week commencing as of August 23, 1993. Such compensation having accrued, the same shall be paid in a lump sum, without commutation, subject to a reasonable attorney's fee hereinafter approved.
2. A reasonable attorney's fee is hereby approved for plaintiff's counsel in the amount of 25% of the compensation benefits due under the above Award, which shall be deducted from the same Award and forwarded directly to him.
3. Defendants are obligated to pay all reasonable and necessary medical compensation expenses incurred by plaintiff as a result of the injury by accident giving rise hereto to the extent the same are reasonably designed to tend to affect a cure of, provide needed relief from, and/or lessen the period of disability associated therewith, when bills for the same are submitted to the carrier and approved in accordance with Industrial Commission Rules. However, at the time of the hearing, other than symptomatic medication to provide relief, plaintiff did not require any active medical treatment, and will not require significant medical treatment absent a substantial change in his condition after that date.
4. Defendants shall bear the costs, including as part thereof expert witness fees in the amount of $325.00 to Dr. Gary Poehling and $300.00 to Dr. Leon Grobler.
 S/ ____________________________ J. RANDOLPH WARD COMMISSIONER
CONCURRING:
S/ ______________________ THOMAS J. BOLCH COMMISSIONER
S/ ______________________ LAURA K. MAVRETIC COMMISSIONER
JRW:md